# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AGINCOURT GAMING, LLC, | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No. _____ |
| | § | |
| | § | JURY TRIAL DEMANDED |
| ZYNGA, INC., | § | |
| | § | |
| *Defendant.* | § | |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Agincourt Gaming, LLC ("Agincourt Gaming") by its undersigned attorneys, for its complaint against Defendant Zynga, Inc. ("Zynga"), hereby alleges the following:

## PARTIES

1.     Agincourt Gaming is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in Dallas, Texas.

2.     Zynga is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in San Francisco, California.

## JURISDICTION AND VENUE

3.     This is a complaint for patent infringement arising under 35 U.S.C. §§ 100, *et seq.*, and in particular § 271.

4.     This Court has exclusive subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the patent laws of the United States.

5.     This Court has personal jurisdiction over Zynga because it has committed and continues to commit acts of patent infringement in this judicial district and because it regularly conducts and solicits business in this judicial district, thus deriving substantial revenue from goods used or services rendered in this judicial district.

6.      Venue is proper pursuant to 28 U.S.C. §§ 1391(b)-(c) and 1400(b) in that Defendant Zynga resides in this district, has a regular and established practice of business in this district, and has committed acts of infringement in this district.

<u>ASSERTED PATENTS</u>

7.      On July 6, 2004, United States Patent No. 6,758,755 ("the '755 patent") was duly and legally issued for an invention entitled "Prize Redemption System for Games Executed Over A Wide Area Network," which also has a related continuation in progress. A true and correct copy of the '755 patent is attached as Exhibit 1.

8.      On October 23, 2001, United States Patent No. 6,306,035 ("the '035 patent") was duly and legally issued for an invention entitled "Graphical User Interface For Providing Gaming And Prize Redemption Capabilities." A true and correct copy of the '035 patent is attached as Exhibit 2.

9.      The '755 patent and the '035 patent issued from a series of applications extending back to November 14, 1996.

10.      Agincourt Gaming was assigned the '755 patent and the '035 patent and continues to hold all rights and interest in both patents.

11.      Zynga designs, makes, markets, uses, offers for sale, and/or sells the following products that infringe the '755 patent and the '035  patent:

(a)      Zynga FarmVille

(b)      Zynga FishVille

(c)      Zynga PetVille

(d)      Zynga YoVille

(e)      Zynga Poker

(f)      Zynga Empires & Allies

(g)      Zynga Mafia Wars

(h)      Zynga Treasure Isle

    (i)     Zynga FrontierVille

    (j)     Zynga CityVille

    (k)    Zynga CafeWorld

    (l)     Zynga Vampire Wars

12.    To redress Zynga's infringement of the '755 patent and the '035 patent, Agincourt Gaming seeks actual damages and a permanent injunction to shut down Zynga's infringing games.

## FACTUAL BACKGROUND

### *The Recent Rise of Social Network Gaming*

13.    The market for video games has changed dramatically in the last ten years, in terms of delivery of game content, the devices on which games are played, and user demographics.

14.    Video games used to be the sole domain of dedicated console providers and high budget PC content producers. But in the last few years, content delivery over the Internet has matured. The rise of social networking has created a new outlet for games and attracted a new type of "casual" gamer.

15.    The widespread popularity of social network games—which incorporate content or social connections over online social networks like Facebook—is a relatively recent phenomenon. As Zynga's founder and CEO has acknowledged, before 2007 "nobody offered games on the web that were available and accessible to everyone. They were confined to niches of hardcore gamers."

16.    Online social gaming has become increasingly popular since 2007, when Facebook opened its website to external developers of ad-on games and other applications. That year, Scrabulous, a game mimicking the popular board-game Scrabble, launched on Facebook and quickly expanded to 500,000 daily users.

17.     Scrabulous may have been the first game to successfully take advantage of Facebook's mammoth social network, but it was hardly the last.  Developers quickly realized that providing games over Facebook would allow them to reach hundreds of millions of potential users, at low cost and with high potential for profits.

18.     Following the early success of Scrabulous, the prevalence and popularity of online social network games skyrocketed.  A July 2010 market research survey revealed that 56.8 million Americans— roughly one fifth of the U.S. population— played a social network game in the prior three months.  Approximately 35% of those users were new to online gaming. It is estimated that nearly 62 million people (or 27% of Internet users) in the United States will play one game on a social network monthly in 2011.  The social gaming industry generated $1 billion in revenue in 2010, and analysts forecast that worldwide social gaming revenues will reach $5 billion per year by 2015.

*The Foundation for Zynga's Success*

19.     Zynga is a social game developer that has quickly cashed in on the cache of social network games.  Since its launch in 2007, Zynga has rapidly grown and is now reportedly valued at $15 billion.  Zynga develops browser-based games that work as application widgets on social networking websites like Facebook.  As of June 2011, Zynga's games on Facebook have over 270 million monthly active users.

20.     But Zynga's remarkable growth has not been driven by its own ingenuity or innovations.  Rather, it has been widely reported that Zynga's business model is to copy creative ideas and game designs from other game developers and then use its market power to bulldoze the games' originators.

21.     Consistent with this reported copycat business strategy, Zynga also has violated Agincourt Gaming's intellectual property rights by infringing the '755 patent and the '035 patent, as set forth below.

### *Agincourt Gaming and the Patents-In-Suit*

22.    Agincourt Gaming is a competing provider of online social network games. Specifically, Agincourt Gaming is a start-up aggregator and renovator of underappreciated games, whose business plan is to acquire already-developed online games and re-package them in a more marketable form.

23.    Online games may be for sale due to insufficient capitalization, insufficient marketing, or poor graphical presentation, even though the fundamental game design is strong. Agincourt Gaming's business model is to acquire such games, and revamp and re-launch them as social network games on websites such as Facebook.  Acquiring and revitalizing games that have underperformed relative to their potential allows Agincourt Gaming to compete in the market for online social network games without the expense and difficulties associated with maintaining an in-house game development team.

24.    Agincourt Gaming already has acquired one such social network game called Pantheon (http://apps.facebook.com/pantheon_game/).  Pantheon practices both the '755 patent and the '035 patent.  Pantheon, like many of Zynga's social network games, provides a prize redemption system based on the outcome of game play.  Pantheon competes with Zynga's games, and Agincourt Gaming is being irreparably harmed by Zynga's infringement of the '755 patent and the '035 patent.

25.    Today, the largest source of revenues for social network game providers is the sale of virtual goods.  Consumers are expected to spend $653 million in virtual goods this year, up from $510 million last year.  Social games typically allow users to obtain virtual goods in two ways, either by earning them via a prize redemption system based on game play or by purchasing them using PayPal or credit cards.  Prize-redemption systems help game providers attract and retain users, who drive advertising revenue and who may eventually decide to pay for virtual goods with actual currency (*i.e.*, by paying legal tender for in-game currency, which can then be used to acquire in-game items).  The ability to provide more and more prizes for players to attain is a key retention component for social games.  Players must consistently have new goals to

strive for within the game, and the acquisition of in-game wealth, status, and/or power is a foundational driver of the social gaming experience.

26.     Agincourt Gaming's patents-in-suit, which claim priority to 1996, were both far ahead of their time in anticipating the development of credits-based online gaming.  Long before the explosion of online games, Agincourt Gaming's patents-in-suit recognized that allowing online gamers to earn and redeem prizes—including, in particular, game enhancements—based on the outcome of game play would be desirable to players but difficult for game providers to effectively maintain and display.

27.     Agincourt Gaming's patents-in-suit solve the problems of incentivizing continuing game play in the context of wide area networks.  They do so in an efficient manner that allows for prize management in a highly scalable system.

## INFRINGEMENT OF U.S. PATENT NO. 6,758,755

28.     Agincourt Gaming incorporates and re-alleges paragraphs 1 through 27 as if fully set forth herein.

29.     Zynga has been and still is infringing the '755 patent, literally or under the doctrine of equivalents, by making, using, importing, offering to sell, and/or selling certain software products, including, but not limited to the products identified in paragraph 11 above.

30.     As a direct and proximate result of Zynga's acts of infringement, Agincourt Gaming has been, is being, and will be damaged.  Zynga's infringement of Agincourt Gaming's exclusive rights under the '755 patent will continue to damage Agincourt Gaming, causing irreparable harm for which there is no adequate remedy at law, unless enjoined by this Court.

31.     Agincourt Gaming also is entitled to recover from Zynga the damages sustained by Agincourt Gaming as a result of Zynga's wrongful acts in an amount subject to proof at trial.

32.     Agincourt Gaming reserves the right to allege, after discovery, that Zynga's infringement is willful and deliberate, entitling Agincourt Gaming to increased damages under

35 U.S.C. § 284 and to attorney's fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

INFRINGEMENT OF U.S. PATENT NO. 6,306,035

33.    Agincourt Gaming incorporates and re-alleges paragraphs 1 through 27 as if fully set forth herein.

34.    Zynga has been and still is infringing the '035 patent, literally or under the doctrine of equivalents, by making, using, importing, offering to sell, and/or selling certain software products, including, but not limited to the products identified in paragraph 11 above.

35.    As a direct and proximate result of Zynga's acts of infringement, Agincourt Gaming has been, is being, and will be damaged.  Zynga's infringement of Agincourt Gaming's exclusive rights under the '035 patent will continue to damage Agincourt Gaming, causing irreparable harm for which there is no adequate remedy at law, unless enjoined by this Court.

36.    Agincourt Gaming also is entitled to recover from Zynga the damages sustained by Agincourt Gaming as a result of Defendant Zynga's wrongful acts in an amount subject to proof at trial.

37.    Agincourt Gaming reserves the right to allege, after discovery, that Zynga's infringement is willful and deliberate, entitling Agincourt Gaming to increased damages under 35 U.S.C. § 284 and to attorney's fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

<u>PRAYER FOR RELIEF</u>

Agincourt Gaming respectfully requests entry of judgment in its favor and against Zynga as follows:

(a) Declaring that Zynga has infringed and continues to infringe the '755 and '035 patents;

(b) Awarding actual damages arising out of Zynga's infringement of the '755 and '035 patents, together with prejudgment and post-judgment interest, in an amount according to proof;

(c) Permanently enjoining Zynga and its officers, agents, employees, and those acting in privity with it, from further infringement of the '755 and '035 patents;

(d) Awarding attorney's fees pursuant to 35 U.S.C. § 285 or as otherwise permitted by law; and

(e) Awarding such other costs and further relief as the Court may deem just and proper.


<u>DEMAND FOR JURY TRIAL</u>

Agincourt Gaming respectfully requests a trial by jury on all issues so triable.


Dated: August 17, 2011                          FARNAN LLP

                                    By:   /s/ Joseph J. Farnan, Jr.
                                          Joseph J. Farnan, Jr. (Bar No. 100245)
                                          Brian E. Farnan (Bar No. 4089)
                                          919 North Market St.
                                          12th Floor
                                          Wilmington, DE 19801
                                          (302) 777-0300
                                          (302) 777-0301 (fax)
                                          farnan@farnanlaw.com

OF COUNSEL:

William Christopher Carmody (NY State Bar No. 4539276)
Tibor L. Nagy, Jr. (NY State Bar No. 4508271)
SUSMAN GODFREY LLP
560 Lexington Avenue, 15th Floor
New York, New York 10022
Telephone: (212) 336-8330
Facsimile: (212) 336-8340
bcarmody@susmangodfrey.com
tnagy@susmangodfrey.com

Amanda Bonn (CA State Bar No. 270891)
SUSMAN GODFREY LLP
1901 Avenue of the Stars, Suite 950
Los Angeles, California 90067-6029
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
abonn@susmangodfrey.com

*Attorneys for Plaintiff Agincourt Gaming, LLC*